UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, )
                          )
              Plaintiff,  )  96-0078 CR-MORENO
                          )  CASE NO. _____ MAGISTRATE JUDGE
                          )                     BANDSTRA
v.                        )
                          )
JEAN-JACQUES HANDALI,     )  INFORMATION
                          )
              Defendant.  )
                          )
_____)

THE UNITED STATES ATTORNEY CHARGES THAT:

1. From on or about April 16, 1993, the exact date being unknown, and continuing thereafter up to and including the date of this information, in Miami, Dade County, in the Southern District of Florida and elsewhere, the defendant, JEAN-JACQUES HANDALI, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree with other persons both known and unknown, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:

2. It was part of the conspiracy that the defendant, JEAN-JACQUES HANDALI, and others both known and unknown, would create and cause to be created and utilize and cause to be utilized foreign "shell" corporations, including Framick Ltd., to disguise certain financial transactions for the purpose of concealing from the Internal Revenue Service the true nature, source and amount of income, said income which was represented to the defendant to be taxable in the United States.

3. It was further part of the conspiracy that the defendant, JEAN-JACQUES HANDALI, and others both known and unknown, would create and cause to be created and utilize and cause to be utilized foreign bank accounts in Switzerland to hide and conceal the source, amount, nature and beneficial ownership of substantial funds represented to be taxable income.

4. It was further part of the conspiracy that the defendant, JEAN-JACQUES HANDALI, and others both known and unknown, would make substantial amounts of money available to their clients in a manner that would not expose such funds to taxation as income.

5. It was further part of the conspiracy that the defendant, JEAN-JACQUES HANDALI, and others both known and unknown, would conceal the full nature, source and extent of their clients' income from the scrutiny of the Internal Revenue

Service and other U.S. government agencies by creating false documentation and by not filing required financial transaction reports.

6.  It was further part of the conspiracy that the defendant, JEAN-JACQUES HANDALI, and others both known and unknown, would create and cause to be created false documentation to support false income tax deductions by which their clients could unlawfully deduct otherwise taxable income.

### OVERT ACTS

In furtherance of this conspiracy and to effect the objects thereof, there was committed by at least one member of the conspiracy, in the Southern District of Florida and elsewhere, one of the following acts:

7.  On or about August 30, 1993, defendant JEAN-JACQUES HANDALI contacted the confidential informant by telephone and advised that he (defendant JEAN-JACQUES HANDALI) had arranged for a courier to contact the confidential informant on September 2, 1993, to conduct a $50,000 currency shipment. Defendant JEAN-JACQUES HANDALI explained the code names which would used for the transaction.

8.  On or about September 1, 1993, defendant Schlomo D'Jamal, a money courier using a code name that defendant JEAN-JACQUES HANDALI had given him, contacted the confidential informant by telephone and arranged a meeting place for the currency transaction at Dollar Time headquarters.

9. On or about September 2, 1993, defendant Schlomo D'Jamal received $50,000 in U.S. currency from the confidential informant outside Dollar Time headquarters and inside the courier's automobile.

10. On or about September 3, 1993, defendant JEAN-JACQUES HANDALI wire-transferred or caused to be wire-transferred $34,982.50 from an account in Geneva, Switzerland, to an account in the United States pursuant to instructions that he received from the confidential informant.

11. On or about October 4, 1993, defendant JEAN-JACQUES HANDALI and defendant Michael Ley met with the confidential informant in London, England, and defendant JEAN-JACQUES HANDALI explained a sophisticated scheme whereby the confidential informant could transfer his alleged taxable income to Switzerland and conceal the true nature, source and amount from the Internal Revenue Service. The alleged source of the income was stated to be from drug smuggling activities by the confidential informant's "cousin."

12. On or about October 7, 1993, the confidential informant met with an accountant at his office in London, England, and discussed the formation and utilization of the offshore shell corporation, Framick, Ltd. The accountant advised the confidential informant that he had forwarded Framick, Ltd.'s documentation to defendant JEAN-JACQUES HANDALI. The accountant further discussed the need for legitimate-looking paperwork in case the U.S. authorities investigated the business transactions.

13. On or about November 3, 1993, the confidential informant met with Schlomo D'Jamal, the money courier, at a South Florida hotel and accepted $150,000 in cash.

14. On or about November 8, 1993, defendant JEAN-JACQUES HANDALI wire-transferred or caused to be wire-transferred $50,000 from Geneva, Switzerland, to an account in the United States.

15. On or about December 14, 1993, defendant JEAN-JACQUES HANDALI met with the confidential informant and his "cousin" (an undercover federal agent posing as a drug smuggler) who needed to conceal the nature, source and amount of his alleged illegal income.

16. On or about December 27, 1993, defendants Henia Matuszewicz and Arie Matuszewicz met with the undercover agent at a South Florida road service plaza when they received $350,000 in cash.

17. On or about December 28, 1993, defendant JEAN-JACQUES HANDALI spoke by telephone to the undercover agent to confirm that the $350,000 transaction was successful. Defendant JEAN-JACQUES HANDALI further advised the undercover could contact defendants Henia Matuszewicz and Arie Matuszewicz again, but that he (defendant JEAN-JACQUES HANDALI) should be advised of all future transactions so as to clear them with the "Uncle" (defendant Albert Shammah).

18. On or about January 10, 1994, defendant JEAN-JACQUES HANDALI met with the undercover agent and received $10,000 in

cash from him to be used in a financial transaction with one of defendant JEAN-JACQUES HANDALI's other clients.

19. On or about January 10, 1994, defendant JEAN-JACQUES HANDALI telephoned defendant Gary S. Kaminsky in South Florida and the two men discussed the ongoing scheme and their concerns about whether the confidential informant and the undercover agent were law enforcement agents.

20. On or about January 18, 1994, defendant JEAN-JACQUES HANDALI met with the undercover agent and received $50,000 in cash to be delivered to a client.

21. On or about February 18, 1994, defendant JEAN-JACQUES HANDALI met with the undercover agent and accepted $250,000 in U.S. currency at a CBI-TDB branch in London, England, and thereafter provided the undercover agent with a receipt.

22. On or about March 2, 1994, defendant JEAN-JACQUES HANDALI sent a facsimile to the undercover agent showing his account balance as $1,296,096.56 and documenting the purchase of a shell corporation for him in the name of Bour Oil and Gas Company, Ltd.

23. On or about March 10, 1994, defendant JEAN-JACQUES HANDALI spoke with the undercover agent and advised that he had spoken to defendant Gary S. Kaminsky who agreed to sign and return the necessary papers to transfer the undercover agent's funds in the Beta Finance account to one controlled solely by the undercover agent.

24. On or about March 14, 1994, defendant JEAN-JACQUES

6

HANDALI wire-transferred or caused to be wire-transferred $95,000 from Geneva, Switzerland, to the undercover agent's purported bank account in Miami, Florida.

25. On or about March 29, 1994, defendant JEAN-JACQUES HANDALI met with the undercover agent at CBI-TDB (Geneva) and accepted $130,000 in cash for deposit to the CBI-TDB account and provided the undercover agent with various documents.

26. On or about April 25, 1994, the undercover agent met with defendant JEAN-JACQUES HANDALI's courier, defendant Joseph Waiche, and delivered $379,800 in cash for transportation out of the United States to Switzerland.

27. On or about May 17, 1994, defendant JEAN-JACQUES HANDALI left a telephone message for the undercover agent advising that CBI-TDB was conducting an internal bank audit, that he should contact defendant JEAN-JACQUES HANDALI, and that he should avoid calls from unknown persons.

28. On or about July 6, 1994, pursuant to defendant JEAN-JACQUES HANDALI's instructions, the undercover agent delivered

$100,000 in cash to the London, England, branch of CBI-TDB.

All in violation of Title 18, United States Code, Section 371.

_____
KENDALL COFFEY
UNITED STATES ATTORNEY

_____
ROGER W. POWELL
ASSISTANT U.S. ATTORNEY

_____
THOMAS E. ZEHNLE
U.S. DEPARTMENT OF JUSTICE
TRIAL ATTORNEY

_____
GREGORY E. TORTELLA
U.S. DEPARTMENT OF JUSTICE
TRIAL ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET *

96-0078cr-MORENO

MAGISTRATE JUDGE
BANDSTRA

Defendant Name  JEAN-JACQUES HANDALI

Count #I  Conspiracy to Defraud United States

Title 18, United States Code, Section 371 (tax fraud)

Max. Penalty:
     5 years; $250,000

Count # _____

Max. Penalty:

Count # _____

Max. Penalty:

Count # _____

Max. Penalty:

Count # _____

Max. Penalty:

Count # _____

Max. Penalty:

Page 1 of __

* This is merely a preliminary estimate of the maximum possible incarceration. It does not include any other possible consequence including but not limited to fine, special assessment, restitution, special parole, probation, supervised release, etc.